REVISED MARCH 25, 2003
**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 01-20368

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

FLORITA BELL GRIFFIN, TERRENCE BERNARD ROBERTS, JOE LEE WALKER,

Defendants-Appellants.

Appeals from the United States District Court
For the Southern District of Texas

March 10, 2003

Before JOLLY, SMITH, and DeMOSS, Circuit Judges.

DeMoss, Circuit Judge:

Appellants Florita Bell Griffin (Griffin), Terrence Bernard Roberts (Roberts), and Joe Lee Walker (Walker) were tried before a jury and found guilty of conspiracy, bribery, money laundering, and mail fraud. On appeal, Griffin, Roberts, and Walker (referred to jointly as "Appellants") challenge the sufficiency of the evidence, a number of the district court's evidentiary rulings, and the calculation of their sentences. In addition, Roberts and Walker contend that they were constructively denied counsel. We AFFIRM in

part, REVERSE in part, and REMAND to the district court for proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Texas Department of Housing and Community Affairs (TDHCA) is the state agency that administers federal and state funds allocated for use in providing affordable housing and community services to low-income households. During 1997 and 1998, TDHCA received $184,767,578.00 and $196,350,078.00, respectively in federal funds. With these funds, the agency administers 25 different federal programs, one of which is the allocation of federal income tax credit incentives (tax credits) that serve as incentives for developers to build housing projects in which certain rental units are set aside for occupancy by low-income persons at reduced rent. TDHCA receives approximately 150 to 200 applications for allocation of tax credits annually, and approximately $24 to $25 million in tax credits are available for allocation annually in Texas.

The affairs of the TDHCA are conducted by a nine-member board of directors, all of whom are state officials. Board members are not paid for their services. When applications for tax credit allocations are submitted, the TDHCA staff scores each application based on subjective and objective factors, and submits a list of recommended applications to a committee made up of three members from the board of directors for review. If the recommended

2

applications are approved by the three-member committee, the board of directors then votes on whether to grant final approval for the allocation of the tax credits on these same applications.

Griffin was appointed to the TDHCA board of directors in 1995. Prior to her appointment, Griffin worked as a planner for the city of Bryan, Texas. In 1997, Griffin chaired the three-member committee that made recommendations to the full board on tax credit applications. In addition, Griffin did consulting work for persons or companies that did business with TDHCA.

Mitchell, a Texas certified public accountant, had prepared housing tax credit applications to the TDHCA for developers on over 160 projects, and 130 of them had been approved. Roberts was a real estate agent who worked for the Brazos Valley Community Action Agency (BVCAA) in 1995, where he was the director of housing projects. BVCAA is a private nonprofit organization that receives funds from the TDHCA and provides affordable housing to low-income households. After meeting at a housing seminar in Austin, Texas, Mitchell and Roberts decided to submit an application for tax credits to build a low-income housing project.

Mitchell and Roberts formed a partnership named "One Golden Oaks, Ltd.," with Roberts having a 51 percent ownership in the partnership. The record indicates that Mitchell was aware that by doing so, One Golden Oaks, Ltd. would be classified as a historically underutilized business (HUB) because Roberts is African-American, which would result in additional points being

3

awarded to their tax credit application with the TDHCA. Mitchell was to serve as the financial partner, and Roberts was to serve as the managing partner. Mitchell agreed to pay Roberts a weekly salary of $1,250.00 from Mitchell's personal funds for Roberts' services to their partnership.

Roberts recommended that Barry Hammond (Hammond) be used as the general contractor to build the project. Roberts had met Hammond in December 1996. At that time, Hammond was working with his wife Michelle as a self-employed home builder of single family residences. Roberts told Hammond that he could offer Hammond's customers down payment assistance. Roberts and Hammond entered an agreement in which Roberts would provide down payment assistance and both of them would share the profits on the sale of each home. A few homes were built as a result of this agreement.

After doing business together, Roberts decided he wanted Hammond to meet Griffin. Roberts and Griffin were friends, and Griffin had served as a consultant to the BVCAA. Roberts introduced Hammond to Griffin in January 1997. The record indicates that Roberts told Hammond that Griffin was on the TDHCA and was responsible for approving millions of dollars each year for developers and builders.

After Griffin met Hammond, she told him that she wanted to see one of the homes he had built. Subsequently, Roberts told Hammond that Griffin was impressed with the home he built and that she wanted to participate in their home building agreement. Griffin

4

told Hammond and Roberts that she could bring to their arrangement interim construction, down payment, and land acquisition assistance from TDHCA. Shortly thereafter, Griffin suggested to Roberts and Hammond that Walker be brought into the project to help buy property and to get it zoned. Roberts and Hammond consented, and all four agreed to split the profits evenly among themselves.

Previously, Hammond had built five to ten houses a year. Under the new arrangement, however, it was anticipated that over 100 houses would be built annually. Griffin suggested that a corporation be formed to ensure that each received his share of the profits. On March 20, 1997, Barry Hammond Homes Incorporated (BHHI) was created. Hammond, Roberts, Griffin, and Walker agreed that the ownership of BHHI and its profits would be split evenly among themselves. In addition, it was agreed that Walker would be paid a salary of $2,500.00 a month after Griffin suggested that Walker be required to work in BHHI's office space rather than at a bail bond company. The record indicates that at this time, the only money BHHI was making was from the sale of previously contracted single family homes.

As indicated in a copy of BHHI's bylaws recovered during a search of Griffin's residence, stock certificates were issued. Some of the stock certificates were filled out by Michelle Hammond and kept at BHHI's place of business in a corporate book. Hammond's and Walker's stock certificates reflected that each received 25,000 shares, which were issued in their names. Roberts'

stock certificates were issued in his mother's name, Johnnie Roberts. Griffin's stock certificates were first placed in the name of J & G Construction. Later, Griffin had the stock certificates placed in the name of Arkofa Consulting Corporation (Arkofa), which is owned by Griffin's brother-in-law, Arlee Griffin Jr.

Subsequent to the incorporation of BHHI, Griffin, Walker, and Roberts held meetings to discuss building Mitchell's and Roberts' housing project, Golden Oaks On Sandy Point Apartments (hereinafter referred to as "the Golden Oaks project"). Those meetings took place on a weekly basis through October 1997. At one of the meetings, Griffin made a list of everyone's duties in the corporation. Hammond's duties were to act as a project supervisor, keep up with material costs, check off on every completed house, schedule tasks, and perform long range planning. Michelle Hammond's duties were administrative support. Roberts was responsible for marketing and sales. Walker's duties were to manage funds, do the bidding on jobs, handle legal work, participate in marketing, handle change orders, and policies and procedures. Griffin's duties were described as to "create opportunity." Significantly, there was never any written consulting agreement between Griffin and BHHI.

Mitchell and Roberts, acting as partners of One Golden Oaks, Ltd., submitted an application for a tax credit allocation for the

6

Golden Oaks project in June 1997.[1]  The application was filled out in the name of One Golden Oaks, Ltd. as owner/developer.  Roberts signed the application as the managing general partner and Mitchell signed as the financial general partner.  BHHI was listed as the general contractor with Hammond's signature as president.  The plan was to build forty two-story fourplexes consisting of 160 apartments.

The record indicates that Walker presented Mitchell with a contract to have BHHI be the builder on the Golden Oaks project. Mitchell believed that only Hammond and Walker were partners in BHHI.  Mitchell was unaware that Griffin had an ownership interest in the corporation.

On September 13, 1997, the TDHCA tax credit allocation committee met to consider the staff report on tax credit applications for 1997.  Walker and Roberts attended this meeting, which was chaired by Griffin.  A staff member read aloud the names of 66 proposed projects, which represented requests for a total of $27,110,996 in tax credits.  One Golden Oaks was one of the 66 projects on the list.[2]  In one unanimous vote in which Griffin participated, the allocation committee agreed that tax credits

---

[1]The best evidence of what the parties in this case contemplated as the terms and conditions of the proposed Golden Oaks project can be found in the application that One Golden Oaks, Ltd. submitted to the TDHCA.  *Government's Exhibit 3.*

[2]The Golden Oaks project is noted on the list as "Golden Oaks on Sandy."

should be allocated to all of the projects on the list.

On September 15, 1997, the TDHCA board of directors met to consider a number of housing matters, including the list of 66 projects vying for the allocation of tax credits for 1997. The entire list of 66 projects was approved for the allocation of tax credits by a vote of seven ayes and one abstention. As a result of the vote, in which Griffin participated, the Golden Oaks project was allocated $10 million in tax credits over a 10 year period with an estimated ultimate cash value of $7.329 million. Walker and Roberts were present at this meeting. Griffin did not disclose her indirect connection (as a shareholder of BHHI) with the Golden Oaks project before participating in this vote or the previous committee vote two days earlier.

After being approved for the allocation of tax credits, One Golden Oaks, Ltd. was required to pay a $40,000.00 commitment fee. Mitchell, as the financial partner of One Golden Oaks, Ltd., put up the commitment fee. At that time, One Golden Oaks, Ltd. also obtained a loan of $450,000.00 from John Hoover (Hoover), using part of the loan proceeds to purchase from BHHI the tract of land described in its application and giving a deed of trust on such land as security for this loan.

Meanwhile, BHHI began having financial trouble. As indicated by the record, BHHI's financial trouble was partly due to the salary being paid to Walker. Another reason was that BHHI paid $5,000.00 in earnest money to purchase 30 lots in a subdivision

8

called Shadow Wood for the purpose of building homes. BHHI intended to build homes at that location by obtaining land acquisition and down payment assistance through TDHCA. Hammond, Walker, Roberts, and Griffin participated in completing the application for assistance, which was submitted to TDHCA in 1997. However, TDHCA's underwriting department determined that the application was insufficient for evaluation and notified BHHI.

Leslie Donaldson, the manager of TDHCA's credit underwriting department who was responsible for evaluating the Shadow Wood project, testified that she was contacted by Griffin at a time when it was unheard of for board members to contact the staff. Griffin inquired about the status of the Shadow Wood application and what was needed to correct any deficiencies. Griffin also asked Donaldson to send her a copy of the deficiency notice and to keep her advised of the status of the application. According to Donaldson, no other board member had ever contacted her with respect to any project during her time with TDHCA.

As a result of BHHI's paying the $5,000.00 for the Shadow Wood project, Hammond told Walker that they were not going to be able to make payroll that week. A few days later, however, Griffin presented BHHI a check for $19,167.00, which was dated June 19, 1997. The check was from KRR Construction and was made payable to BHHI. Griffin told Hammond that she was loaning the money to BHHI. KRR Construction was named as the managing general partner on a TDHCA tax credit application for a project called Prairie Estates.

9

Griffin later voted to approve the Prairie Estates application on September 15, 1997, during the same board meeting at which she voted to approve the Golden Oaks project's tax credit application.

Hammond testified that BHHI had not performed any work for KRR Construction, and that KRR Construction did not owe BHHI any money. However, Joseph Kemp (Kemp), who was a former member of the TDHCA board and the owner of KRR Construction, testified that he paid Walker $19,167.00 to assist him in preparing a study for an application to TDHCA for tax credits after he left the board. Kemp paid Walker for the study even though it was not of any help to him. Walker then did a second study, which also was of no help to Kemp. Kemp later hired a third party for $4,500.00 to do a study that was eventually submitted with his TDHCA tax credit application.

Hammond testified that he used the $19,167.00 that Griffin gave BHHI to make the corporation's payroll. On the same day that Griffin gave BHHI the check, Griffin had Michelle Hammond create an invoice dated May 23, 1997, from BHHI to KRR Construction charging $19,167.00 for consulting and site planning. In addition, Hammond and Walker signed a promissory note in the amount of $19,167.00 from BHHI to J & G Construction dated June 23, 1997, which was created by Walker pursuant to Griffin's instructions. According to Hammond, BHHI had not done any business with J & G Construction and had not done anything to owe it money. Significantly, Manson B. Johenson, who is the sole owner and employee of J & G Construction,

10

testified that he never authorized anyone to enter into a promissory note on behalf of J & G Construction and that BHHI never owed J & G Construction $19,167.00.

BHHI paid back portions of the $19,167.00 to Griffin beginning on September 5, 1997, when it issued a check to Griffin's husband, Richard W. Griffin, from money it received from a construction draw. Griffin's signature was on the back of the check and the memorandum on the check read "soil investigation." An invoice dated August 1997, which was written on "Richard W. Griffin, Ph.D." letterhead, billed BHHI for $5,000.00 for soil investigation on a 108 acre tract in Bryan, Texas. The top of the document had the name of "Genesis Planning, Inc." written on it, which was Griffin's consulting company. Both Hammond and his wife Michelle testified that Richard Griffin never did any work for BHHI.

In order to build the Golden Oaks project, One Golden Oaks Ltd. needed to obtain land. Mitchell relied on Roberts to select the land. The record indicates that Roberts told Mitchell that Richard Smith (Smith) owned land that would be appropriate for the project, but that Smith would not return his calls. Roberts also told Mitchell that Walker knew Smith, and Smith owed Walker a favor. Roberts believed that Walker could successfully negotiate the purchase of the land. Mitchell agreed to pay Walker $5,000.00 to negotiate the purchase price of the land and to apply for zoning with the city of Bryan, Texas. Smith, however, testified that Roberts had not tried to contact him about buying the land before

11

Walker made inquiries.  In fact, Walker first contacted Smith in 1995 about buying the land, telling Smith that he had an investment group interested in the land.

Smith owned approximately 130 acres and did not want to subdivide the land.  As a result, Walker was able to negotiate the purchase of all 130 acres at $2,000.00 per acre on behalf of BHHI.  BHHI in turn sold 23.208 acres to One Golden Oaks, Ltd. for $15,000.00 an acre.  Twelve acres were intended for the Golden Oaks project.  The remaining 11.208 acres were purchased for a possible second phase project at the recommendation of Roberts.  Mitchell was never told how much BHHI paid for the land.

Before these land transactions occurred, Hammond, Roberts, Walker, and Griffin discussed the fact that there was going to be money and land left over.  They agreed to split the remaining land, which was approximately 108 acres, evenly among themselves.  About 40 acres of the remaining acres were in the flood plain, so Griffin suggested the land be divided into eight parcels, four parcels inside and four parcels outside the flood plain.  Each member of BHHI would receive one parcel from the flood plain and one parcel from outside the flood plain.

Griffin had Don Garrett Engineering subdivide the property.  Kenneth Ray Havel (Havel), who assisted in dividing the remainder property, asked Griffin for instructions on how she wanted the land to be divided.  Havel noted that equal parts would not be of equal value because of the location of roads through the property.

Griffin told Havel that she still wanted equal parts. Hammond, Roberts, Walker, and Griffin drew straws to see who would receive which parcels of land. Hammond drew the piece that had the best location. Roberts, however, told Hammond that Griffin should receive that parcel because she approved the projects and had loaned BHHI $19,167.00 without being fully repaid. As a result, Hammond drew again and Griffin received the parcel of land that was considered the best.

After the survey of the land was completed, Roberts requested additional copies. Quitclaim deeds were prepared by Roberts at Walker's house. Hammond's parcels were titled in his own name. Walker's were put in the name of his son, Bryce Walker. Roberts' were put in the name of his mother, Johnnie Roberts. Griffin had her portion of the land put in the name of Arkofa.

Arlee Griffin testified that he never gave Griffin permission to use Arkofa's name in connection with any enterprise. Arlee Griffin further testified that Griffin first told him on Thanksgiving 1997 about putting property in Arkofa's name, noting that she would give him details later. Approximately a week later, Griffin sent Arlee Griffin documents to sign, which assigned the land to Griffin. Arlee Griffin testified that he never discussed the details of the transaction with Griffin. In addition, Arlee Griffin testified that in April 1998, Griffin asked him to sign a second quitclaim deed in relation to the same property, which assigned the rights of the property from Arkofa to Walker.

13

According to Arlee Griffin, he had no idea why Griffin asked him to sign the property rights over a second time.

On October 17, 1997, three checks in the amount of $3,347.66 were issued to Hammond, Johnnie Roberts, and Walker from BHHI. The check issued to Johnnie Roberts was endorsed by both Johnnie Roberts and Roberts. A fourth check was issued on October 31, 1997, to Walker from BHHI in the amount of $2,370.71. Both Hammond and his wife Michelle testified that that money was Griffin's, but that she requested the money be issued to her through Walker. The record also reflects that an undated invoice for $479.00 and an invoice for $497.95 dated October 20, 1997, for concrete work on Griffin's garage were billed to BHHI. The fourth check, combined with the two invoices, totaled $3,347.66, which is the same amount as the three checks issued to Hammond, Johnnie Roberts, and Walker.

On October 26, 1997, BHHI received a check for $28,890.65 from a title company, which was the amount of money left over from the land BHHI sold to One Golden Oaks, Ltd. From that money, $9,500.00 was paid to Loan Consultants, Inc. on October 16, 1997, for a seminar on how to start a mortgage company. Griffin, Walker, and Roberts attended the seminar. Another $6,000.00 was used to pay contractors and payroll that week. The remaining $13,000.00 was split four ways among the partners of BHHI.

In November 1997, Hammond, Michelle Hammond, Roberts, Walker, and Griffin met at a restaurant where Walker and Roberts told

14

Hammond that Griffin wanted another construction company for the Golden Oaks project. Roberts said that Griffin was willing to pay Hammond $20,000.00 for his 28 acres and to give him $77,000.00 for his interest in the Golden Oaks project. Hammond refused the offer because he did not want to miss out on his share of the money expected from the tax credits allocated to the Golden Oaks project.

In early December 1997, Michelle Hammond overheard Roberts, Walker, and Griffin discuss the creation of Lee Commercial Construction Management (LCCM) for the purpose of replacing BHHI as general contractor. After learning of this, Hammond became afraid that he was going to be cut out of the Golden Oaks project. As a result, Hammond decided to tape record the next conversation he had with Roberts and Walker. Hammond first called Roberts and asked if LCCM had been created yet, and Roberts told him no. Hammond also asked if he and Michelle were going to be cut out of the Golden Oaks project or the Shadow Wood project. Roberts told him that they were not being cut out of the projects even though LCCM was being incorporated. Hammond reiterated that he was afraid that he was being cut out of the Golden Oaks project. Roberts responded that he should not be worried because Griffin had no control over who received profits. Roberts also stated that "all [Griffin] got control over is to [sic] keeping us from getting more projects."

During the conversation, Roberts told Hammond that Griffin suggested that no stock be issued in LCCM. Hammond voiced his concern about that fact, and Hammond suggested that Walker join

15

them in the conversation so Hammond could express his concern. After Walker joined them for a three-way conversation, Hammond repeated his concern about LCCM's not issuing stock and asked if they were still going to split the profits four ways. Walker responded by saying he did not have any answers. However, Walker said that Griffin had acknowledged that Hammond would be out of the deal only if he agreed to sell his stock.

Walker also said that he had asked Griffin if she wanted to cut Hammond out of the Shadow Wood project and that she told him no. Walker then stated that Hammond could not expect Griffin to come to the office and explain what the group was doing, but that he did not expect Griffin to keep either Roberts or himself from informing Hammond about the progress they were making. Walker also noted that Griffin was still talking about splitting the profits four ways.

Walker incorporated LCCM on December 8, 1997. Both Roberts and Walker suggested to Mitchell that One Golden Oaks Ltd. use LCCM in place of BHHI because Hammond had a drug problem and had left Bryan, Texas. The record indicates that One Golden Oaks, Ltd. agreed to replace BHHI with LCCM as the general contractor on the Golden Oaks project.[3] However, when Mitchell and Roberts, on behalf of One Golden Oaks, Ltd., attempted to get interim financing

---

[3]Although the record indicates that LCCM replaced BHHI as the contractor for the Golden Oaks project, the record does not contain an amended TDHCA application evidencing this change.

for the Golden Oaks project, they were unsuccessful because LCCM could not get a performance bond because Walker had no previous construction experience as a building contractor.

One Golden Oaks, Ltd. had until April 22, 1998, to get an interim construction loan or it would lose the allocation of tax credits. Mitchell and Roberts agreed that they needed a new contractor. Nevertheless, Mitchell agreed to pay LCCM for its continued involvement in the project. On January 30, 1998, One Golden Oaks Ltd. contracted to pay LCCM $92,000.00 for construction services, with $20,000.00 paid up front. In a second contract, One Golden Oaks Ltd. agreed to pay LCCM $35,000.00, with $15,000.00 up front for its continued help in obtaining zoning for the project. In a third contract, One Golden Oaks Ltd. agreed to pay LCCM $38,000.00, with $15,000.00 up front, to obtain financing for the project. LCCM received and cashed two $15,000.00 checks and one $20,000.00 check as a result of those contracts.

Walker withdrew $23,333.00 in cash from LCCM's account on January 30, 1998, which was the same day that three checks from One Golden Oaks Ltd. were deposited. On February 5, 1998, a cashier's check for $23,333.00, dated January 30, 1998, was deposited into Griffin's bank account. The cashier's check showed LCCM as the remitter and Arkofa as payee. Arlee Griffin testified that he never knew about the check. In addition, although Arlee Griffin's name appears on the back of the check, he never endorsed it. Notably, at trial, Griffin admitted that LCCM did not owe Arkofa

17

$23,333.00.

Of the remaining $26,667.00 deposited into LCCM's account, $13,333.00 was issued in the form of a check to Ozell Roberts. Of that amount, $8,333.00 was deposited into Roberts' savings account and $5,000.00 was then withdrawn in cash. Another check for $5,300.00 was drawn on the LCCM account, payable to cash and signed by Walker.

In 1998, Stephen Weiss (Weiss), a real estate developer who owned construction and property management companies in Connecticut, New York, and Texas, was looking for land for a tax credit project. Arlee Griffin, who had introduced Weiss to Griffin in the spring of 1996, suggested that he consider a piece of property consisting of 21 acres in Bryan, Texas, adjacent to the Golden Oaks project. Weiss learned that Walker owned the property that Arlee Griffin recommended. Walker informed Weiss that he wanted $500,000.00 for the 21 acres. Although Weiss thought the price was high, he was willing to proceed with the purchase if a tax credit allocation supported the price. Weiss later learned from the title report, because of the quitclaim deeds referencing Arkofa that Arlee Griffin might have an interest in the land.

Nevertheless, Weiss entered into a contract with Walker to buy the 21 acres contingent upon his obtaining all municipal approvals and approval by TDHCA for tax credit allocation for the intended project called Glen Oaks Village. On April 24, 1998, a promissory note in the amount of $425,000.00 was executed from Walker to

18

Arkofa in exchange for the same property described in the quitclaim deed from Arkofa to Walker. The record indicates that Walker did nothing to owe Arkofa $425,000.00. Ultimately, the Glen Oaks Village project's zoning application was turned down by the city of Bryan, and the project's tax credit application was withdrawn.

Eventually, Hammond brought Mitchell a copy of the tape recording from the three-way telephone conversation he had with Roberts and Walker. Mitchell learned from Hammond that his partner Roberts also was a partner in BHHI and had profited from the land sale between One Golden Oaks Ltd. and BHHI. Moreover, Mitchell learned that Griffin was a 25 percent owner of BHHI and that she also had profited from the land sale.

As a result, Mitchell decided to record a conversation with Roberts on May 4, 1998. Mitchell wanted an explanation concerning money that he had paid to Walker for services not performed. Roberts said that Walker's response concerning that information was that Walker did not owe Mitchell an explanation. Mitchell also wanted to know who owned BHHI and LCCM. When Mitchell asked Roberts about the ownership of those companies, Roberts told him that Walker had said he was a partner with Hammond in BHHI and that Walker owned LCCM. When asked if BHHI was owned by just Hammond and Walker, Roberts said yes. Roberts never told Mitchell that he and Griffin were also part owners of BHHI.

Furthermore, Mitchell told Roberts that his attorney found out that the land BHHI purchased from Smith was no longer owned by the

19

corporation, but that it had been deeded to four people. Mitchell noted that one of the deeds was in the name of Bryce Walker and the other was in the name of Johnnie Roberts. When Mitchell asked Roberts how his mother ended up with the land, Roberts said that Hammond owed him $96,000.00. Mitchell also noted that he was aware that Hammond and Arkofa had 21 acres of land. When asked, Roberts denied knowing who owned Arkofa. In response, Mitchell stated that if Arkofa was owned by Griffin or one of her family members, "it's not going to be good, let me tell ya." When Mitchell asked Roberts about the $28,890.65 left over from BHHI's land purchase from Smith, Roberts told Mitchell that he did not receive any of that money and he did not know who got the money.

Based on what Mitchell learned from Hammond and his telephone call with Roberts, he decided to seek the advice of his attorney concerning the legality of the activities that had transpired. Mitchell's attorney contacted the U.S. Attorney's Office, which in turn contacted the F.B.I. The F.B.I.'s investigation into the matter ultimately resulted in a grand jury's issuing a seven count indictment on April 23, 1999.

Count 1 charged Griffin, Roberts, and Walker with conspiracy to: (1) violate 18 U.S.C. § 666(a)(1)(A) relative to theft by fraud of property valued at $5,000.00 or more, which was in the custody and control of the TDHCA; (2) violate 18 U.S.C. § 666(a)(1)(B) relative to accepting something valued at $5,000.00 or more, with the intent to corruptly influence business transactions of the

20

TDHCA; (3) violate 18 U.S.C. § 666(a)(2) relative to corruptly giving something valued at $5,000.00 or more, with the intent to influence business transactions of the TDHCA; and, (4) violate 18 U.S.C. § 1956(a)(1)(B)(i) relative to money laundering; all in violation of 18 U.S.C. § 371 for conspiracy to defraud the United States.[4] Count 2 charged Griffin, Roberts and Walker for theft or aiding and abetting a theft from an organization that receives benefits under a federal assistance program in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2. Count 3 charged Griffin with soliciting and accepting a bribe in connection with the business of an organization that receives benefits under a federal assistance program in violation of 18 U.S.C. § 666(a)(1)(B). Count 4 charged Roberts and Walker with bribery of an agent of an organization that receives benefits under a federal assistance program in violation of 18 U.S.C. § 666(a)(2). Count 5 charged Griffin and Walker with money laundering proceeds that were obtained as part of the illegal transactions in Counts 1, 2, and 3, all in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Count 6 charged Griffin, Roberts, and Walker with mail fraud in violation of 18 U.S.C. § 1341 for using the mail to deliver a pre-application for One Golden Oaks to the Honorable Lonnie Stabler, the Mayor of the City of Bryan, Texas. Count 7 charged Griffin and Walker with mail fraud in violation of 18

_____

[4]It should be noted that the conspiracy count (Count 1) does not contain any allegations about conspiracy to violate the Mail Fraud Statute as described in Counts 6 and 7 of the Indictment.

21

U.S.C. § 1341 for using the mail to deliver a pre-application for Glen Oaks Village to the Honorable Lonnie Stabler, the Mayor of the City of Bryan, Texas.

The case was tried to a jury from October 16, 2000 to November 2, 2000. All three defendants were found guilty on all of the counts with which they were charged. On March 28, 2001, the district court sentenced Griffin to 87 months in the Bureau of Prisons as to Counts Two, Three, and Five; and she received 60 months in the Bureau of Prisons as to Counts One, Six, and Seven. All of Griffin's sentences were to run concurrently. Both Roberts and Walker were sentenced to a total of 57 months. In addition, the court imposed a three year term of supervised release on all three Appellants and assessed a $100.00 special assessment for each count of conviction. Furthermore, the court held the Appellants jointly responsible for $783,455.00 in restitution to Mitchell. Griffin filed her notice of appeal on April 4, 2001. Roberts and Walker filed their notices of appeal on April 6, 2001, and April 16, 2001, respectively.

## II. DISCUSSION

Roberts and Walker appeal their convictions arguing that the government failed to present sufficient evidence that they were aware Griffin was using her state position to fraudulently obtain tax credits. As a result, they assert that the government failed as a matter of law to present sufficient evidence to convict them

of the specific intent crimes for which they were convicted. Roberts and Walker also contend that their respective attorneys were not serving their best interests, but rather those of Griffin. Therefore, they both argue that their representations were constitutionally deficient because they were constructively denied counsel. Moreover, Roberts and Walker contend that the district court erred by applying sentencing guidelines based on gains unrelated to the alleged crimes for which they were convicted as well as on the unrealistic expectations of profits instead of any proven reasonable revenues.

Griffin appeals her convictions arguing that the district court erred in allowing Ms. Daisy Stiner (Stiner), former executive director of the TDHCA, to read and explain various provisions of the Texas Penal Code concerning Griffin's ethical requirements and violations of the law. Griffin also asserts that the district court erred by allowing the government to put on F.B.I. Agent Robert Martin (Martin) as one of its earliest witnesses to present the testimony of a traditional witness. In addition, Griffin asserts the district court erred when it refused to allow Griffin to testify to conversations that she had with other persons on the ground that the conversations constituted hearsay, and for refusing to allow Griffin's counsel to argue Texas state law on ethics to the jury during closing arguments. Furthermore, Griffin contends that the district court erred in failing to dismiss Count Five of the indictment for insufficiency of the evidence to convict for

23

money laundering, and Counts Six and Seven of the indictment for insufficiency of the evidence to convict for mail fraud. Finally, Griffin argues that the district court erred in calculating her sentence.

**A.  *Whether the district court abused its discretion by allowing Daisy Stiner, director of the TDHCA, to testify on state law provisions; and, if so, whether it was harmless.***

Griffin argues that the district court abused its discretion by allowing Stiner to testify regarding applicable state law. This Court reviews a district court's evidentiary rulings for abuse of discretion. *United States v. Miranda,* 248 F.3d 434, 440 (5th Cir.), *cert. denied,* 122 S. Ct. 410 (2001). We also review the district court's admission or exclusion of expert testimony for abuse of discretion. *United States v. Wise,* 221 F.3d 140, 157 (5th Cir. 2000), *cert. denied,* 121 S. Ct. 1488 (2001). Expert testimony that has been admitted erroneously is subject to harmless error analysis. *Id.*

Stiner testified on behalf of the government as its first witness. Notably, she was never qualified as an expert witness. Stiner was asked to read from a number of state statutes. Although Griffin's counsel did not object to the reading of the statutes because they were relevant, her counsel did object when the government's lawyer asked Stiner hypothetical questions on the applicability of those statutes. The district court overruled the objection.  Griffin asserts that Stiner's answers to the

24

hypothetical questions amounted to giving expert testimony on the law without being qualified as an expert. Although Stiner was not qualified as an expert in the law, she was permitted to give opinion testimony as a lay witness under Rule 701 of the Federal Rules of Evidence, which allows a lay witness to give opinion or inference testimony that is: "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701.

The record reflects that Stiner testified as to her understanding of the state ethics rules and what TDHCA employees were instructed about those rules. In addition, the record reflects that Stiner's testimony was based on her own perceptions, was testimony that could be helpful to the jury in understanding the issues in the case, and certainly did not require specialized knowledge. However, the record also reflects that Stiner testified to her own interpretation of the law, which is error. *See **Huff v. United States,*** 273 F.2d 56, 61 (5th Cir. 1959). Where objected to testimony is cumulative of other testimony that has not been objected to, the error that occurred is harmless. ***United States v. Sotelo****,* 97 F.3d 782, 798 (5th Cir. 1996).

We find any error that occurred from the district court allowing Stiner to testify as to the meaning of the law was

25

harmless because her testimony was cumulative of other witnesses' testimony.  For example, Karen Lundquist, general counsel for the Texas Ethics Commission, testified to the meaning of "personal or private interest" in a decision before the board under Tex. Govt. Code § 572.058, as did David Mattax, chief of the Financial Litigation Division of the Attorney General's Office.  Lundquist also testified on the Ethics Commission's issuance of advisory opinions under the Texas Government Code.  In addition, Griffin called Larry Paul Manley, an attorney and CEO of TDHCA, to testify on his opinion of state ethics law as to a board member's having an interest in the proposal before the board.  Therefore, viewing the record in its entirety and the cumulative nature of Stiner's testimony, the error that occurred was harmless.

**B.   Whether the district court abused its discretion in allowing F.B.I. Agent Martin to testify and use a chart to give an overview of the case; and, if so, whether it was harmless.**

Griffin also contends that the district court abused its discretion in allowing Martin to give "conclusionary hearsay testimony on ultimate jury issues that were crucial to the case."  As noted above, we review a district court's evidentiary rulings for abuse of discretion.  *Miranda,* 248 F.3d at 440.  We consider any errors under the harmless error doctrine.  *United States v. Taylor,* 210 F.3d 311, 314 (5th Cir. 2000).  We affirm evidentiary rulings "unless they affect a substantial right of the complaining party."  *Id.*

26

As the government's second witness, Martin testified to the F.B.I.'s investigation in this case. In so doing, he used a chart containing pictures of persons and symbols for the entities involved in the alleged conspiracy. While Martin was testifying, the prosecutor referred to a picture of Roberts on the chart and asked Martin to explain Roberts' role in the alleged conspiracy. Martin's testimony also included the statement: "Dr. Griffin is on the TDHCA board, has voting authority over tax credit projects. She also is a 25-percent owner in B. Hammond Homes." On cross-examination, Martin admitted that his statement that Griffin owned 25 percent of BHHI was not based on personal knowledge but on what someone told him.

Griffin's attorney objected on the basis of hearsay on more than one occasion during Martin's testimony. The prosecutor responded that Martin's impression of Roberts' role was not being offered for the truth of the matter asserted, but to give a broad version as to what the agents did during their investigation and why they did it. The prosecutor stated that evidence in support of Martin's impressions would be presented later during the trial. The prosecutor also stated that the government had documents to back up Martin's testimony. The district court overruled the objection and allowed the testimony to continue in an overview manner in order to orient the jury because of the complexity of the case. However, the district court made it clear at various points during Martin's testimony that he was presenting his own or the

27

F.B.I.'s point of view and that he did not have personal knowledge of all the facts or statements about which he testified.

Griffin argues that Martin's testimony was improper because he was never qualified as an expert witness under Rule 702 of the Federal Rules of Evidence, and because the government did not establish a factual foundation for lay witness opinion under Rule 701 of the Federal Rules of Evidence. Furthermore, Griffin asserts that there was nothing for Martin to summarize because Stiner was the first witness and did not testify to most of the facts of the case. Moreover, she insists that it was improper for the district court to characterize Martin's testimony as the F.B.I.'s point of view.

"There is an established tradition, both within this circuit and in other circuits, that permits a summary of evidence to be put before the jury with proper limiting instructions." *United States v. Scales,* 594 F.2d 558, 563 (5th Cir. 1979) (citations omitted). However, "[t]he purpose of the summaries in these cases is simply to aid the jury in its examination of the evidence already admitted." *Id.* (citing *United States v. Downen,* 496 F.2d 314 (10th Cir. 1974)). Here, of course, the evidence had not yet been presented. Martin, therefore, was testifying more as an "overview witness" than a summary witness. *See United States v. Cline,* 188 F. Supp. 2d 1287, 1299 (D. Kan. 2002) (labeling the government's witness who defendant asserted was being called to "testify before

28

there is any evidence admitted to summarize and who will give essentially a second opening statement" as an "overview witness").

This Court has never had the opportunity to address the use of an overview witness where the witness is put on the stand to testify before there has been any evidence admitted for the witness to summarize. We unequivocally condemn this practice as a tool employed by the government to paint a picture of guilt before the evidence has been introduced. Permitting a witness to describe a complicated government program in terms that do not address witness credibility is acceptable. However, allowing that witness to give tendentious testimony is unacceptable. Allowing that kind of testimony would greatly increase the danger that a jury "might rely upon the alleged facts in the [overview] as if [those] facts had already been proved," or might use the overview "as a substitute for assessing the credibility of witnesses" that have not yet testified. **Scales**, 594 F.2d at 564. We hold, therefore, that the district court abused its discretion in allowing the government to utilize Martin as an overview witness to testify to issues in dispute.

We now must determine if the district court's abuse of discretion was harmless error. We have chosen to use our precedent on summary witness testimony to help guide our analysis in this case because that body of law is the most analogous issue to the one before this Court on which we have previously ruled.

29

In *Scales,* we permitted the use of a summary chart in a complex case, noting that "[t]he facts summarized were entirely objective, and . . . uncontested," there was no credibility issue, the summary was neutral, and the trial judge gave a limiting instruction. *Id.* at 564.

In *United States v. Meshack,* the government made use of a chart that presented the defendant's financial transactions and was used as an aid during a witness's testimony. 225 F.3d 556, 581 (5th Cir. 2000) Although the district court did not give a proper limiting instruction, we found that there was no plain error because: (1) the chart was not admitted into evidence; (2) the chart did not go to the jury room; (3) the defense had an opportunity to cross-examine the witness about the chart; and, (4) the defense did not show on appeal that the chart contained misleading or erroneous information. *Id.* at 582.

In *Taylor,* the government made use of an organizational chart similar to the one here that showed pictures of the people involved in a drug conspiracy and their relationships. 210 F.3d at 314. The government placed the chart before the jury during opening statements and when the witnesses were questioned about it. *Id.* at 314-315. However, at other times the chart was turned away from the jury. *Id.* at 315. At the close of the government's case, the chart was admitted into evidence as a summary of testimony. *Id.* Defense counsel objected to the chart both before opening

30

statements and when the prosecutor moved its admission into evidence. *Id.* The district court gave two instructions on the chart's use. *Id.* The court instructed the jury after the government's opening statement that "the chart reflected what the government believed the facts to be, but that it would be up to them to evaluate whether it was an accurate depiction of the events." *Id.* The second instruction, which was given after the chart was admitted into evidence, instructed the jury that "the chart should be evaluated just like any other evidence and should be given whatever weight the jury deemed appropriate." *Id.*

We noted in *Taylor*:

[T]he use of charts as "pedagogical" devices intended to present the government's version of the case is within the bounds of the trial court's discretion to control the presentation of evidence under Rule 611(a) [of the Federal Rules of Evidence]. Such demonstrative aids typically are permissible to assist the jury in evaluating the evidence, provided the jury is forewarned that the charts are not independent evidence.

*Id.* (internal quotations and citations omitted). We held that it was error to admit the chart because we found that it did not accurately reflect the underlying record or testimony. *Id.* at 316. We held that this was not harmless error because the chart gave the defendant a more central role in the conspiracy than the evidence supported, and the chart was before the jury throughout the trial. *Id.*

The record in this case indicates that the district court did

31

not give a limiting instruction to the jury aside from stating that Martin's testimony consisted of impressions. Significantly, defense counsel did not ask for limiting instructions. The record, however, also indicates that Martin's testimony and use of the chart were meant to clarify the roles of the various participants in the alleged fraudulent tax credit scheme, which was arguably complicated and difficult to understand.

Furthermore, as in *Meshack,* the record reflects the district court clearly noted that defense counsel would have an opportunity to cross-examine Martin and expose any of his testimony that was not supported by admissible evidence. Also, the chart used by Martin was not admitted into evidence or sent into the jury room. Moreover, Griffin has not shown this Court that the information provided by Martin's testimony or the chart was misleading or erroneous. Rather, the record indicates that Martin's overview testimony and the chart were supported by other witnesses' testimony and exhibits admitted into evidence. Martin's testimony, viewed in light of the record as a whole, had little, if any, affect on the jury's verdict. We conclude, therefore, that Martin's testimony and the use of the chart were harmless.

## C. Whether the evidence is sufficient to support Griffin's money laundering conviction.

"In evaluating a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and uphold the verdict if, but only if, a rational juror could have

found each element of the offense beyond a reasonable doubt." *United States v. Brown,* 186 F.3d 661, 664 (5th Cir. 1999). In order to find that the defendant committed the offense of money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), "the government must prove that the defendant: (1)conducted or attempted to conduct a financial transaction, (2) which the defendant knew involved the proceeds of unlawful activity, and (3) which the defendant knew was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity." *United States v. Burns,* 162 F.3d 840, 847 (5th Cir. 1998).

Griffin asserts there is insufficient evidence to support her conviction for money laundering. She moved for a judgment of acquittal at the close of the government's evidence, which was denied by the district court. The government argues that Griffin committed money laundering by concealing her ownership of the land she received from BHHI and placing it in the name of Arkofa, her brother-in-law Arlee Griffin's company. Although Griffin acknowledges that she put the land in Arkofa's name, she argues that she did not have the requisite "intent to conceal" because she had her brother-in-law deed the property back to her nine days later and because both Walker and Roberts were aware of this transaction. Notably, there is no evidence in the record that the property was ever deeded back to Griffin. Rather, the record indicates that she had her brother-in-law deed the property to

33

Walker.

There is no doubt that Griffin engaged in a financial transaction, satisfying the first prong of the test. We also find that a jury could reasonably infer that she had knowledge that what she was doing was unlawful, which satisfies the second prong of the test. Under Texas law, as an officer of the state, Griffin had a duty to not "accept other employment or compensation that could reasonably be expected to impair [her] independence of judgment in the performance of [her] official duties. . . ." **TEX. GOVT. CODE ANN. § 572.051(3)** (Vernon 2001). In addition, Griffin could not "intentionally or knowingly . . . accept[] . . . any benefit as consideration for [her] decision, opinion, recommendation, vote, or other exercise of [her] discretion as a public servant. . . ." **TEX. PENAL CODE ANN. § 36.02** (Vernon 2001). Even if Griffin was only a consultant to BHHI as she claims, she accepted money from BHHI to work on the Golden Oaks project and then voted in favor of the project as a TDHCA board member without disclosing her indirect connection with it. We conclude, therefore, that a jury could reasonably infer that she accepted a benefit--ownership in BHHI and/or profits from BHHI's transactions--in exchange for her vote. Lastly, Griffin did deed property she received from BHHI to her brother-in-law. However, there is no public record of the property ever being transferred back to Griffin. Rather, even if Griffin had considered having the property deeded back to her, the record

34

indicates that she had her brother-in-law deed the property to Walker so he could sell it. Thus, a jury could have reasonably interpreted Griffin's transfer of the property to her brother-in-law and then to Walker as an act of concealment, satisfying the third prong of the test.

Griffin argues that her co-conspirators' knowledge of this transaction shows she was not concealing anything. This Court, however, has held that "concealment can be established by showing that 'the transaction is part of the larger scheme designed to conceal illegal proceeds.'" ***United States v. Pipkin,*** 114 F.3d 528, 534 (5th Cir. 1997) (citation omitted). As we have already discussed above, the record indicates that all of the co-conspirators, including Griffin, participated in the larger scheme to obtain tax credits by bribing Griffin for her vote as a member of TDHCA's board of directors. Walker's and Roberts' knowledge of Griffin's transfer of property to her brother-in-law does not necessarily mean that she did not attempt to conceal the bribery scheme. Rather, the jury could have reasonably found that all of the Appellants participated in this concealment, as evidenced by the fact that they placed money and property they received from the Golden Oaks project in the names of people other than themselves. We conclude, therefore, that the evidence was sufficient to support Griffin's money laundering conviction.

***D. Whether the evidence is sufficient to support the Appellants' mail fraud convictions.***

Appellants moved for a directed verdict of acquittal on the charges of mail fraud at the close of the government's evidence, claiming that there was insufficient evidence to convict under Counts 6 and 7 of the indictment. Count 6 of the indictment charged that Griffin, Walker, and Roberts committed mail fraud by mailing a pre-application notification for tax credits for the Golden Oaks project to the City of Bryan, Texas, for the purpose of defrauding the TDHCA, State of Texas, United States, and to obtain money and property by false pretenses. Count 7 of the indictment charged that Griffin and Walker committed mail fraud by mailing a pre-application notification for tax credits for the Glen Oak Village project to the City of Bryan, Texas, for the purpose of defrauding the TDHCA, State of Texas, United States, and to obtain money and property by false pretenses. On appeal, the Appellants renew their argument that there was insufficient evidence of mail fraud to support a violation of 18 U.S.C. § 1341. Section 1341 of Title 18 of the United States Code prohibits the use of the mails in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises. . . ."

Walker and Roberts contend, as they do for all of the counts for which they were convicted, that there is no support for their mail fraud convictions because they were not aware of Griffin's intent to vote for their project. Griffin, however, relies on

36

*Cleveland v. United States* in which the Supreme Court held that, for the purposes of 18 U.S.C. § 1341, state and municipal licenses are not property in the hands of the official licensor. 531 U.S. 12, 15 (2000).[5] Griffin contends that tax credits are like licenses in that they do not exist until they are issued and, therefore, the district court should have dismissed Counts 6 and 7. The government, however, argues that tax credits are a valuable commodity and an economic incentive, unlike the licenses at issue in *Cleveland,* which mainly implicated a regulatory concern of the state.

Furthermore, the government contends on appeal that the district court instructed the jury that "[a] 'scheme to defraud' included any scheme to deprive another of money, property, or of the intangible right to honest services by means of false or fraudulent pretenses, representations, or promises." The government, citing *United States v. Powers,* 168 F.3d 741 (5th Cir. 1999), argues that because the jury was instructed on both the defrauding of property and honest services theories, and the evidence supports either, this Court should affirm because the jury had a right to consider both theories. Griffin, however, replies that the district court's instruction amounts to a constructive amendment of Counts 6 and 7. Section 1346, which provides that

[5]*Cleveland* was decided five days after the end of appellants' trial, which explains why appellants did not mention it in their objections at trial.

37

"the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services," is not referred to in either Count 6 or 7 of the indictment; and the words "intangible right to honest services" do not appear anywhere in the indictment. Likewise, in its jury argument, the government did not refer in any manner to the provisions of section 1346 nor to the specific language of the district court's instructions. We first address whether tax credits can be property in the hands of the TDHCA and then whether the jury instructions amounted to a constructive amendment.

### 1. Tax credits as property.

We conclude that, in accordance with the Supreme Court's decision in *Cleveland,* there was insufficient evidence to support a conviction of mail fraud under 18 U.S.C. § 1341 because the low-income housing tax credits were not property until they had been issued. *Cleveland* involved a Louisiana law that authorizes the State to award nontransferable, annually renewable licenses to operate video poker machines. 531 U.S. at 15. Under the law, applicants for the licenses must meet certain requirements designed to ensure that they have good character and fiscal integrity. *Id.* The defendants were indicted on RICO charges in connection with a scheme to bribe state legislators to vote in a manner favorable to the video poker industry. *Id.* at 16. Included in the indictment was the predicate act of mail fraud in violation of 18 U.S.C. §

38

1341.  *Id.* at 16-17.  The indictment alleged the defendants fraudulently concealed in their applications that they were the true owners of a certain business establishment because they had financial and tax problems that could have undermined their chances to receive the video poker licenses.  *Id.* at 17.

The defendants moved to dismiss the indictment claiming that the alleged fraud did not deprive the State of property under section 1341.  *Id.*  The government, however, argued that the State had a property right in the licenses before they were issued because the State received a substantial amount of money in exchange for each license and continued to receive payments from licensees as long as the licenses were in effect.  *Id.* at 21.  The government also argued that the State had significant control over the licenses' issuance, renewal, suspension, and revocation, which indicated the licenses were property.  *Id.* at 21-22.

The Supreme Court in *Cleveland* agreed with the defendants and reversed their mail fraud convictions, holding that section 1341 does not reach fraud in obtaining a state or municipal license. The Court found that the gaming licenses were not property in the government regulator's hands and section 1341 speaks only to the protection of money and property.  *Id.* at 20.  Any benefit that the government derives from Section 1341 must be limited to the government's interests as a property holder.  *Id.* at 19-20.  In reaching this conclusion, the Court noted that it did not doubt

39

that Louisiana had a substantial economic stake in the video poker industry. *Id.* at 22. Although the State collected up front processing fees for each license, the Court noted that the State received "the lion's share of its expected revenue not while the licenses remain in its own hands, but only *after* they have been issued to licensees." *Id.* (emphasis in original) The licenses, noted the Court, do not generate an ongoing stream of revenue before they are issued. *Id.* According to the Court, finding that the processing fees amounted to a property right would result in "the conclusion that States have property rights in any license or permit requiring an up front fee, including drivers' licenses, medical licenses, and fishing and hunting licenses," which the government conceded were "purely regulatory." *Id.*

The Court, in **Cleveland**, then addressed the government's contention concerning the State's right to control the issuance, renewal, and revocation of video poker licenses. The Court noted that the "intangible rights of allocation, exclusion, and control amount to no more and no less than Louisiana's sovereign power to regulate." *Id.* at 23.

Furthermore, the Court held that the government's reading of the mail fraud statute would result in a sweeping expansion of federal criminal jurisdiction without a clear statement of intent from Congress. *Id.* at 24. The Court stated:

Equating issuance of licenses or permits with deprivation

> of property would subject to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities. We note in this regard that Louisiana's video poker statute typically and unambiguously imposes criminal penalties for making false statements on license applications.

*Id.* Thus, as it had in previous cases, the Court noted that "'unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance' in the prosecution of crimes.'" *Id.* at 25 (quoting *Jones v. United States,* 529 U.S. 848, 858 (2000)). In addition, the Court noted that it has instructed that "'ambiguity concerning the ambit of criminal statutes should be resulted in favor of lenity.'" *Id.* (quoting *Rewis v. United States,* 401 U.S. 808, 812 (1971)). Therefore, to the extent that the meaning of the word "property" might be ambiguous as used in section 1341, the Court concluded that "'it is appropriate, before [the Court] choose[s] the harsher alternative, to require that Congress should have spoken in language that is clear and definite.'" *Id.* (quoting *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 222 (1952)).

We conclude that *Cleveland* is controlling in this case. Unissued tax credits have zero intrinsic value. Therefore, tax credits are not property when they are in the TDHCA's possession. As a result, section 1341 does not reach fraud in obtaining the allocation of tax credits in this case. The tax credits at issue derive from Congress' Tax Reform Act of 1986. Each year, state and

41

local agencies are granted low-income housing tax credits by the United States Treasury Department. Local entities then reallocate these tax credits to qualified low-income projects. TDHCA is the only entity in the State of Texas with the authority to reallocate tax credits under this program. Once tax credits have been allocated, they cannot be transferred from the property to which they were allocated. If the tax credits cannot be used because the property to which they were allocated does not become a low-income residence, the federal government reclaims the tax credits. The tax credits are not actually issued on a project involving new construction, as was the case for the Golden Oaks project, until the rental units actually have been constructed and placed in service at reduced rent for low-income occupants. Once the tax credits have been issued on a property, the owner can sell limited partnership interests in the property so that investors can take advantage of the tax credits allocated to that project. *See generally* 26 U.S.C. § 42.

As with the issuance of the gaming licenses in **Cleveland,** THDCA collects up front fees such as application fees and commitment fees. Beyond those fees, however, TDHCA does not derive any benefit, gain, or income from tax credits while it possesses them. After the tax credits have been issued, TDHCA also may collect some fees such as an annual compliance monitoring fee. However, those fees amount to nothing more than program fees

42

necessary to carry out the State's power to regulate the issuance of the tax credits. In fact, the benefit that the State of Texas receives from those fees is minute compared to the benefit that is realized from the creation of affordable rental housing, which is the goal of the tax credit program. Unquestionably, that benefit is not realized when the tax credits have been allocated to the State for distribution. Rather, that benefit is realized only after the tax credits actually have been issued into the developers' possession so they can be sold to investors who can use them to offset their federal income tax obligations. In sum, the only property interest the State has in the tax credits is purely abstract or theoretical, even after the entire transaction between the State and a developer is completed. Unissued tax credits, therefore, do not amount to economic property as contemplated by section 1341 while they are in the TDHCA's possession.

### 2. *Constructive amendment to Counts 6 and 7.*

"A constructive amendment occurs when the trial court 'through its instructions and facts it permits in evidence, allows proof of an essential element of a crime on an alternative basis permitted by the statute but not charged in the indictment.'" *United States v. Arlen,* 947 F.2d 139, 144 (5th Cir. 1991) (quoting *United States v. Slovacek,* 867 F.2d 842, 847 (5th Cir. 1989)). There is no doubt that the Fifth Amendment guarantees a criminal defendant that he will only be tried on the charges that have been alleged in an

43

indictment handed down by a grand jury, which "cannot be 'broadened or altered except by the grand jury.'" *Id.* (quoting *United States v. Chandler,* 858 F.2d 254, 256 (5th Cir. 1988)")". As the Supreme Court has explained:

> To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him.

*Russell v. United States,* 369 U.S. 749, 770 (1962).

Therefore, when a constructive amendment has occurred and error has been properly preserved, we have made it clear that "the conviction cannot stand; there is no prejudice requirement." *United States v. Mikolajczyk,* 137 F.3d 237, 243 (5th Cir. 1998). However, neither Griffin's attorney nor counsel for Walker and Roberts objected to the district court's instruction that included the deprivation of an intangible right of honest services language. As a result, we must review this issue for plain error. *United States v. Dixon,* 273 F.3d 636, 639-40 (5th Cir. 2001). Under this standard of review, we may correct forfeited errors only if (1) there was an error, (2) the error was clear or obvious, and (3) the error affected the defendant's substantial rights. *See United States v. Olano,* 507 U.S. 725, 731-34 (1993); *Dixon,* 273 F.3d at 639-40. Even if these three conditions are met, this Court may

44

correct a forfeited error only if it "'seriously affect[s] the fairness, integrity, or public reputation of the judicial proceedings.'" *Olano,* 507 U.S. at 736 (quoting *United States v. Atkinson,* 297 U.S. 157, 160 (1936)).

We find that the requirements for granting relief under the plain error standard of review have been satisfied. There is no doubt that the district court erred by instructing the jury that a scheme to defraud includes "a scheme to deprive another of the intangible right to honest services" because the indictment did not contain a reference to 18 U.S.C. § 1346 or its language. And, that error was obvious. Furthermore, we can not permit the district court to second guess "what was in the mind[] of the grand jury at the time [it] returned the indictment." *Russell,* 369 U.S. at 770. To do so would violate the Appellants' Fifth Amendment right to indictment by a grand jury and undermine the public's faith in the integrity of our judicial proceedings. Therefore, we hold that the district court's jury instruction amounted to a constructive amendment of Counts 6 and 7 of the indictment.

Based on the foregoing, we hold that unissued tax credits do not amount to economic property under 18 U.S.C. § 1341. We also hold that the district court's jury instruction constructively amended Counts 6 and 7 of the indictment. Therefore, the Appellants' mail fraud convictions must be reversed.

*E.    Whether the government failed to present sufficient evidence that Walker and Roberts were aware of Griffin's activities and,*

45

*therefore, failed as a matter of law to present sufficient evidence to support their convictions of the specific intent crimes.*

Walker and Roberts contend that the government failed to present sufficient evidence that they were aware of Griffin's criminal activities. Where counsel failed to move for a judgment of acquittal at the close of the government's case, the sufficiency of the evidence challenge is reviewed only to determine if the defendant's conviction constitutes a manifest miscarriage of justice. *United States v. Maldonado,* 735 F.2d 809, 817 (5th Cir. 1984). Although a motion for a judgment of acquittal was eventually filed by counsel for Griffin after both sides had closed, neither Walker's nor Roberts' counsel filed such a motion at the close of the government's case. Therefore, the standard of review here is the manifest miscarriage of justice standard. *Id.* In reviewing the record, this Court "must consider all the evidence, direct and circumstantial, in the light most favorable to the jury's verdict, accepting all reasonable inferences and credibility choices in favor of that verdict." *Id.*

As already discussed above, we have concluded that low-income housing tax credits are not property in the hands of the State for purposes of mail fraud under 18 U.S.C. § 1341. Rather, the tax credits become property only after they have been issued and are in the control of the developers and investors of the projects to which the tax credits have been allocated. Therefore, for the same reasons discussed above, Walker's and Roberts' mail fraud

46

convictions must be reversed.

In addition to their mail fraud convictions, Walker and Roberts were convicted of (1) aiding and abetting Griffin in committing theft of tax credits in violation of 18 U.S.C. §§ 2 and 666(a)(1)(A); (2) aiding and abetting the bribery of Griffin with money and land with the intent to influence Griffin to vote to approve the Golden Oaks project's tax credit application in violation of 18 U.S.C. § 666(a)(2); and (3) with conspiracy to commit theft, bribery, and money laundering in violation of 18 U.S.C. § 371.  In addition, Walker was convicted of aiding and abetting in the laundering of bribery proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(I).

A person who aids or abets the commission of an offense against the United States is punishable as a principal.  18 U.S.C. § 2.  To establish aiding and abetting under 18 U.S.C. § 2, "the defendant 'must have (1) associated with a criminal venture, (2) participated in the venture, and (3) sought by action to make the venture successful.'" *United States v. Carreon-Palacio,* 267 F.3d 381, 389 (5th Cir. 2001) (citation omitted).  In order to convict on the theft of tax credits in violation of 18 U.S.C. § 666(a)(1)(A), the jury must find that the government agent knowingly converted government property valued at more than $5,000.00 to the use of another.  To be guilty of bribery under 18 U.S.C. § 666(a)(2), a defendant must "corruptly give[], offer[], or

47

agree[] to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State . . . in connection with any business, transaction, or series of transactions of such . . . agency involving anything of value of $5000.00 or more."  And, as previously noted, in order to convict for the laundering of bribery proceeds under 18 U.S.C. § 1956(a)(1)(B)(i), the government must prove that the defendant "(1) conducted or attempted to conduct a financial transaction, (2) which he knew involved the proceeds of unlawful activity, (3) with the intent either to conceal or disguise the nature, location, source, ownership, or control of the proceeds of unlawful activity." *Pipkin,* 114 F.3d 528, 534 (5th Cir. 1997).

Walker and Roberts insist that the government did not prove that they had sufficient knowledge to be convicted under the above statutes.  Specifically, they argue that the government did not prove that they knew Griffin was going to vote on the Golden Oaks project's tax credit application, planned for her to vote on the application, or knew that she was not going to disclose her interest in the project.  Walker and Roberts note that although Hammond testified that Griffin's role was to vote on projects for BHHI and to use her influence, Hammond did not specifically testify that they were aware of that role.  The government, on the other hand, asserts that the evidence of Walker's and Roberts' leadership roles in the scheme, the money they received, their acts of

48

deception in concealing that money by placing it in other people's names, and their attendance at meetings with Griffin and Hammond to discuss the Golden Oaks project prior to Griffin's vote shows that they had sufficient knowledge of the scheme to support their convictions.

Although the government did not provide much in the way of direct evidence of Walker's and Roberts' knowledge concerning the bribery scheme, we conclude that it provided adequate circumstantial evidence from which knowledge could have been inferred by the jury. This Court has held that a jury can infer a defendant's knowledge of the scope of the conspiracy from the defendant's important role in that conspiracy. *See, e.g., United States v. Hayles,* 471 F.2d 788, 793 (5th Cir. 1973)(evidence that defendants were leaders in counterfeiting conspiracy supported, in part, convictions for conspiracy, making counterfeit money with intent to defraud, possessing counterfeit money with intent to defraud, and transfer of counterfeit money with intent to defraud). We also have held that proof of a close association between the defendant and a key player in the conspiracy can be probative of the defendant's guilty knowledge. *See, e.g., United States v. Beckner,* 134 F.3d 714, 720 (5th Cir. 1998) (acknowledging that, where counsel has intimate association with client's activities, a jury may reasonably infer knowledge of their illegal nature, even absent direct evidence).

49

The evidence in the record is sufficient for a jury to infer that Walker and Roberts played a role in the bribery scheme, and that they had a close association with Griffin, whom the government alleges was the key player in the scheme. Walker's role, according to the evidence presented by the government, was to represent Griffin's interest throughout the scheme. The record indicates that Walker was paid a salary by BHHI at Griffin's discretion and that he accepted a large portion of Griffin's share of the monetary proceeds from the land sale in his name. Walker was later deeded Griffin's portion of the land so that it could be sold to Stephen Weiss. Moreover, evidence was presented to show that Walker created a false promissory note from BHHI to J & G construction in the amount of $19,167.00 to guarantee BHHI's debt to Griffin; that LCCM was placed in his name so he could control the money; that he received $23,333.00 from Mitchell on behalf of LCCM and paid it to Griffin through Arkofa; that he endorsed the $8,216.72 check from BHHI to LCCM, and used the proceeds to pay Griffin; and, that he kept a written record of the $19,167.00 debt BHHI owed to Griffin. Finally, the government presented evidence that Walker offered to act as a liaison by speaking to Griffin about Hammond's concern that he was going to be cut out of the Golden Oaks project, which indicates that Walker and Griffin had a close association.

In addition, the record contains evidence that Roberts' role was to convince Mitchell to use BHHI to build the Golden Oaks project and to use Walker to obtain the land. As a result, the

government argued that Roberts defrauded TDHCA by intentionally involving BHHI in the scheme wherein Griffin's ownership interest in the corporation and her receipt of land and money from Walker, Roberts, and Hammond, in exchange for her vote to approve the project, was not disclosed. In support of that contention, the government presented evidence that Roberts' role in convincing Mitchell to use Walker to obtain the land for the Golden Oaks project was crucial to the scheme because it made Mitchell's purchase money available to pay the bribe to Griffin. Lastly, the government showed that Roberts played a crucial role in introducing Griffin and Walker to Hammond for purposes of entering into the agreement to share ownership of BHHI.

This Court also has held that guilty knowledge can be inferred from deception. *See, e.g., United States v. Thomas,* 120 F.3d 564, 570 (5th Cir. 1997) (defendant's "patently false statement [was] circumstantial evidence of [defendant's] guilty knowledge"). The record in this case indicates that the government presented evidence that Walker and Roberts placed the land they received in third party names. Further, Roberts placed cash disbursements he received in the name of his mother; and he later placed $13,333.00 of the $50,000.00 check Mitchell wrote for Walker's services in the name of Ozell Roberts. Moreover, during the recorded conversation Roberts had with Mitchell, Roberts denied being one of the owners of BHHI when the evidence clearly shows that was not true. Also,

51

Roberts claimed that he did not receive any of the $28,000.00 disbursement from the land sale when the record indicates that he did. We conclude that the above evidence is sufficient for a jury to impart knowledge to both Walker and Roberts as a result of deception.

Therefore, we conclude that there was sufficient evidence in the record for a jury to find that Walker and Roberts had knowledge of the bribery scheme. The record contains evidence that they both played an integral part in the scheme and had a close association with Griffin, the key player in the scheme. The record also contains enough evidence of Walker's and Roberts' use of deception to conceal the scheme.

**F.    Whether the district court erred in restricting Griffin's testimony of her out-of-court conversations.**

Griffin contends that the district court erred in refusing to let her testify to the contents of conversations that she had with Walker and Roberts, though the court allowed her to testify regarding the topics of those conversations. Griffin's counsel did not object to this ruling by the district court, so plain error review applies. As noted above, to withstand plain error review (1) there must have been an error, (2) that was clear or obvious, and (3) that affected the defendant's substantial rights. *Olano,* 507 U.S. at 731-34; *Dixon,* 273 F.3d at 639-40. Even if these conditions are met, the error must have seriously affected "the fairness, integrity, or public reputation of the judicial

52

proceedings" before it will be corrected by this Court. *Olano,* 507 U.S. at 736; *Dixon,* 273 F.3d at 640.

Griffin argues that she sought to introduce the testimony concerning her out-of-court conversations to show her state of mind or intent, and not to show the truth of the statements made during the conversations. According to Griffin, therefore, the testimony was not hearsay. Ultimately, Griffin argues that the jury was unable to determine if what she did and said was reasonable because she could not explain what precipitated her actions.

Griffin has not made it clear to this Court how her substantial rights have been affected by the district court's decision not to allow her to testify to the content of her out-of-court statements. A review of the record, furthermore, reveals no effect to Griffin's substantial rights or the integrity of the trial. Therefore, we conclude that under the plain error standard, there is no basis for reversal on this issue.

## G. Whether the district court abused its discretion by allowing evidence of similar incidences of misconduct by Griffin.

This Court reviews the admission of extrinsic acts evidence for abuse of discretion. *United States v. Route,* 104 F.3d 59, 63 (5th Cir. 1997). The admissibility of evidence of other acts is controlled by Rule 404(b) of the Federal Rules of Evidence, which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however,

53

be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

**FED. R. EVID. 404(b).** We employ a two-part test to determine whether evidence is admissible under Rule 404(b): "(1) whether the evidence is relevant to an issue other than the defendant's character and (2) whether the evidence possesses probative value that is not outweighed substantially by the danger of unfair prejudice and is otherwise admissible under Rule 403." *Route,* 104 F.3d at 63. "Evidence that is 'inextricably intertwined' with the evidence used to prove the crime charged is not 'extrinsic' evidence under Rule 404(b). "Such evidence is considered 'intrinsic' and is admissible 'so that the jury may evaluate all circumstances under which the defendant acted.'" *United States v. Navarro,* 169 F.3d 228, 233 (5th Cir. 1999) (quoting *United States v. Royal,* 972 F.2d 643, 647 (5th Cir. 1992) (citation omitted)).

Three witnesses testified to extrinsic acts by Griffin. Griffin's attorney objected to the testimony of these witnesses. The district court, however, overruled the objections concluding that the testimony went to the issue of knowledge and intent concerning Griffin's use of her office for personal gain.

Brenda Jenkins, executive director of the Texas Public Utility

54

Commission in 1996, testified that the General Services Commission was planning on awarding a contract worth between $4 million and $10 million to move the Public Utility Commission from leased space to government-owned space. The process for awarding the contract involved issuing a state-wide request for bids. Jenkins stated that Griffin came to her office with two men to discuss the possibility of doing the work. Griffin identified herself as a commissioner with TDHCA and stated that as they were all "Aggies" from Texas A&M University, Jenkins should consider using her influence to help them get the contract. The record indicates that Jenkins did not enter any agreement to help Griffin obtain the contract.

Jenkins' testimony clearly was extrinsic because it had nothing to do with the case at hand. However, the government notes that it called Jenkins as a rebuttal witness, after Griffin testified that she had never used her position as a board member for personal gain. Griffin called two people who worked at TDHCA to testify that they were never influenced by her. Jenkins then testified on rebuttal as to Griffin's alleged attempt to influence her on the Public Utility Commission's contract.

In *United States v. Gibson,* James Gibson was charged with conspiracy to manufacture and to possess with intent to distribute methamphetamine, possession of methylamine and maintaining a place for the purpose of manufacturing and distributing a controlled

55

substance.  55 F.3d 173, 175 (5th Cir. 1995).  Melvin Hazelton was indicted as part of the same conspiracy and pled guilty to one count pursuant to a plea agreement.  Hazelton testified against Gibson.  *Id.*  Gibson's defense was that he was completely innocent of involvement in or even knowing of the production and distribution of methamphetamine, and that Hazelton was lying.  *Id.* at 180.  In rebuttal, the government called a witness to testify that Gibson had sold him "speed" several times, but there was no indication that these sales were related to any of the charged conduct.  *Id.* at 179.  The district court admitted the testimony, and we affirmed.  We found that the evidence was relevant because it "merely completed the picture as to appellant's true involvement in and knowledge of the drug world, thereby correcting a distorted view of appellant's testimony."  *Id.* at 180.  We find *Gibson* to be akin to the case at hand in that Jenkins' rebuttal testimony refuted Griffin's claim that she never used her position to influence anyone.

Paul Todd, senior administrator of BVCAA, testified during the government's case-in-chief and on rebuttal.  He testified on direct that Roberts was the housing director of BVCAA and had contacts with TDHCA.  He further testified on direct and on rebuttal that Griffin proposed to act as a consultant to BVCAA on a low-income housing project that would be funded by TDHCA, while Griffin was on the TDHCA board.  BVCAA did not participate in the proposed

56

project.

The government argues that Todd's testimony provided background information on Griffin's and Roberts' relationship and their experience in funding housing projects through TDHCA. We agree. Moreover, Todd's testimony concerning Griffin's having approached him about the low-income housing project goes directly to Griffin's involvement in the conspiracy. The evidence clearly has probative value that outweighs any prejudice given the other evidence presented on Griffins and Roberts' relationship and the conspiracy.

Finally, Leslie Donaldson, manager of the credit underwriting department at TDHCA, testified that Griffin contacted her directly about a tax credit application for the Shadow Wood project. The record indicates that Griffin requested that Donaldson fax her a memorandum regarding the deficiencies in the application and that Donaldson keep her advised throughout the process. According to Donaldson, that form of contact by a TDHCA commissioner was "absolutely unheard of." The record, nevertheless, indicates that Donaldson did fax the requested information to Griffin, and followed up with Griffin throughout the process.

The government argues that Donaldson's testimony about the Shadow Wood project was intrinsic evidence because that project involved the same participants as this case. In addition, the government claims that the down payment on the land for the Shadow Wood project was part of the reason BHHI was having financial

problems.  But, the district court admitted the evidence as extrinsic because it went to knowledge and intent only.  Although Griffin argues that knowledge, intent, and motive were not at issue at trial because her defense was that she did not own any part of BHHI and had done nothing wrong, the government still bore the burden of proving that she acted with the requisite intent when she voted on the tax credit applications and took bribes.  Also, we note that Donaldson was called as a rebuttal witness, so her testimony was properly admitted to rebut Griffin's claim that she had never tried to influence anyone.

Therefore, we conclude that the district court did not abuse its discretion by allowing in evidence of similar incidences of misconduct by Griffin.  Jenkins' and Donaldson's testimony was rebuttal evidence.  Todd's testimony had probative value that outweighed any prejudice given the other evidence presented during the trial.

**H.   Whether the district court abused its discretion by limiting Griffin's attorney's closing argument.**

We review the rulings of a district court concerning statements made during a closing argument to which a party preserved an objection for abuse of discretion. *United States v. Kang,* 934 F.2d 621, 627 (5th Cir. 1991).  When a party fails to preserve an objection to a district court's limitations on an attorney's closing argument, we review any alleged error for plain error only. *United States v. Baptiste,* 264 F.3d 578, 591 n.10 (5th

58

Cir. 2001).

The record reflects that during closing argument, Griffin's attorney attempted to present an argument concerning the statutes related to Texas' ethics laws, and that Griffin had not violated those laws. The government objected. In response, the district court did not specifically sustain the objection. Rather, the district court explained that although the parties could argue the relevance of state law, the case ultimately was one of federal law.

Griffin's attorney then continued his closing argument, discussing Griffin's relationship with TDHCA and noting that the former employees of TDHCA who testified during the trial still had some form of business relationship with TDHCA. Griffin's attorney also stated that the ethical standards brought up by the government were for the state legislature to decide and that even if the jury did not agree with those laws, only the state legislature could change them, not the federal prosecutors. The district court then told Griffin's attorney that he needed to get back to the issues at hand and noted that Griffin was "not a former member [of TDHCA], she's not accused of being a former member. She is accused of being a member and then taking certain actions." Griffin's attorney responded: "Well, I certainly do know that, Your Honor, but this is my argument." The district court responded: "I understand. Let's not get off--I just don't want the jury to get off on any of--." Griffin's attorney then continued his argument moving on to a different topic.

Griffin contends that the protestation, "Your Honor, but this is my argument," is sufficient to constitute a viable objection. Griffin further argues that her attorney's statement should amount to an objection particularly considering the fact that the district court interrupted the closing argument and indicated that the lawyer was not properly addressing the issues. Thus, Griffin asserts that the district court abused its discretion by interrupting her attorney's closing argument in the manner it did.

We do not agree that Griffin's attorney's protestation was a viable objection. Nevertheless, whether we apply an abuse of discretion standard or plain error standard, we conclude that the record does not support a finding that the district court improperly limited the closing argument. The district court made clear to the jury that it should follow the elements of the crime as laid out in the court's charge, and that what the attorneys were rightfully doing during their closing arguments was arguing the evidence. Although Griffin's attorney was able to argue that she did not violate Texas law, it was not improper for the district court to tell him to move on when he started arguing that it was up to the Texas legislature to change Texas' ethics laws, not the federal prosecutor, as that has no relevance to the case. Therefore, any limitation on Griffin's closing argument that resulted from the district court's interruption did not amount to an abuse of discretion or plain error.

*I.    Whether Walker and Roberts were constructively denied counsel.*

Walker and Roberts did not argue to the district court that they were constructively denied counsel.  Generally, this Court cannot determine a claim of inadequate representation on direct appeal when the claim has not been raised before the district court.  *United States v. Freeze,* 707 F.2d 132, 138 (5th Cir. 1983). "Only when the record is sufficiently developed with respect to such a claim, will we determine the merits of the claim."  *Id.* (citing *United States v. Phillips,* 664 F.2d 971, 1040 (5th Cir. 1981)).

Walker and Roberts argue that they were constructively denied counsel because their lawyers deferred to Griffin's counsel and thereby represented only Griffin's interests.  They also argue that their lawyers failed to subject the government's case to meaningful adversarial testing.  Specifically, Walker and Roberts complain that their attorneys did not raise the defense that they were unaware of Griffin's illegal activities because doing so would have been inconsistent with Griffin's defense that she did not own part of BHHI and therefore had done nothing wrong.

Additionally, Walker and Roberts argue that their attorneys did not make motions for separate trials.  Furthermore, their attorneys did not object when the government elicited testimony that was damaging to them.  In particular, the government elicited evidence of the sale of land to Mitchell by BHHI for $15,000.00 an

61

acre, even though BHHI had only paid $2,000.00 an acre for the land. Walker and Roberts argue that this land sale was irrelevant to the charged counts, even though the government argues that the sale showed a concert of action in relation to BHHI and revealed the source of the bribe to Griffin. Walker and Roberts also point out that the district court expressed concern at several points during the trial that Griffin's attorney seemed to be representing everyone, even though Walker and Roberts might have different interests.

Notably, Griffin's attorney filed "boilerplate" objections to Walker's sentencing on his behalf, which were the same as those filed for Griffin and not specific to Walker's interests. The district court, however, refused to allow Griffin's attorney to represent Walker because of his loyalty to Griffin, who had different legal and factual positions. The district court also questioned Roberts' attorney as to whether he truly was "comfortable that he has represented Roberts' interests without regard to Griffin." The district court then reiterated that it had told Walker and his counsel "in no uncertain terms, that Mr. Walker needed separate counsel, truly separate counsel."

In order for an attorney's assistance to be so defective as to require reversal of the conviction, the defendant must make two showings:

> First, the defendant must show that counsel's performance
> was deficient. This requires showing that counsel made
> errors so serious that counsel was not functioning as the

62

> "counsel" guaranteed the defendant by the Sixth
> Amendment.   Second, the defendant must show that the
> deficient performance prejudiced the defense.   This
> requires showing that counsel's errors were so serious as
> to deprive the defendant of a fair trial, a trial whose
> result is reliable.

*Strickland v. Washington,* 466 U.S. 668, 687 (1984).  However, the defendant need not make a specific showing of prejudice in a limited number of cases.  These include:  (1) "the complete denial of counsel," such as "if the accused is denied counsel at a critical stage of his trial;" (2) situations in which "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing;" and, (3) "on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial."  *United States v. Cronic,* 466 U.S. 648, 659-660 (1984). "A constructive denial of counsel occurs in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all."  *Gochicoa v. Johnson,* 238 F.3d 278, 284 (5th Cir. 2000)(citation omitted).  Walker and Roberts allege that their representation at trial completely failed to subject the prosecution's case to meaningful adversarial testing and, therefore, they were constructively denied counsel.

In *Burdine v. Johnson,* this Court held that the defendant was

63

denied counsel and was entitled to a presumption of prejudice when his lawyer repeatedly slept as evidence was being introduced against him. 262 F.3d 336, 338 (5th Cir. 2001) (en banc). Additionally,

> [w]e have found constructive denial in cases involving the absence of counsel from the courtroom, conflicts of interest between defense counsel and the defendant, and official interference with the defense; and have stated that constructive denial will be found when counsel fails to subject the prosecution's case to any meaningful adversarial testing.

*Gochicoa,* 238 F.3d at 284. However,

> we have refused to find a constructive denial where defense counsel investigated only certain issues, where counsel's trial presentation was "somewhat casual," where counsel failed to pursue a challenge based on racial bias in jury selection, to object to a variation between the indictment and the jury charge, or to raise a meritorious issue on appeal. Thus, prejudice is presumed, and *Washington*'s second prong inapplicable, only when the defendant demonstrates that counsel was not merely incompetent but inert, distinguishing shoddy representation from no representation at all. When the defendant complains of errors, omissions, or strategic blunders, prejudice is not presumed; bad lawyering, regardless of how bad, does not support the *per se* presumption of prejudice.

*Id.* at 284-85 (citations and internal quotations omitted). The attorneys' acts of which Walker and Roberts complain fall in this latter group of cases. The record indicates that there was no complete absence of counsel, no actual conflict between the attorneys and their clients, and no official interference. In addition, Walker's and Roberts' attorneys made opening statements, albeit after the government's case. Both attorneys also questioned

64

some of the witnesses and made closing statements. We find, therefore, that prejudice cannot be presumed in this case.

Furthermore, Walker and Roberts have not shown this Court that their counsels' performance was deficient under the first prong of *Washington*. In other words, they have not shown that their counsels' errors were serious enough to constitute a deficiency, or that they suffered actual prejudice. A decision by co-defendants to proceed with a unified defense is one of trial strategy, and not a basis for an ineffective assistance claim. *See United States v. Mooney,* 769 F.2d 496, 499-500 (8th Cir. 1985).

Additionally, although Walker and Roberts argue that their attorneys were deficient in failing to seek separate trials, the Supreme Court has indicated that a severance of co-defendants' trials should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. 534, 539 (1993). We have found that a defendant did not suffer prejudice from the joinder of his trial with a co-defendant when there was sufficient evidence to convict the defendant. *See United States v. Broussard,* 80 F.3d 1025, 1036-37 (5th Cir. 1996). Lastly, Walker and Roberts have not shown prejudice in that the outcome of the trial would have been different absent any alleged errors. We find, therefore, that Walker and Roberts were not

constructively denied counsel.

***J.     Whether the district court erred in sentencing the Appellants in its calculations of the benefits to be received from the bribes, the existence of multiple bribes, and the amount of restitution owed to Mitchell.***

All three Appellants assert that the district court erred in calculating their sentences.  In reviewing a sentence imposed by a district court under the federal sentencing guidelines, "'we review the trial court's findings of fact for clear error and review purely legal conclusions or interpretations of the meaning of a guideline *de novo.*'"  ***United States v. Canada,*** 110 F.3d 260, 262-63 (5th Cir. 1997) (quoting ***United States v. Kimbrough***, 69 F.3d 723, 733 (5th Cir. 1995).  Clear error exists if this court is left with a definite and firm conviction that a mistake has been made.  ***Estate of Jameson v. Commissioner,*** 267 F.3d 366, 370 (5th Cir. 2001).

As to Griffin's sentence, the district court applied a total offense level of 29 and a criminal history category of I.  The district court began with a base offense level of 10 under U.S.S.G. § 2C1.1, which is applicable to offenses under 18 U.S.C. § 666(a)(1)(B).  The court then increased the offense level by 2 under U.S.S.G. § 2C1.1(b)(1) because it found that there was more than one bribe.  The court also increased the offense level by an additional 13 under U.S.S.G. § 2C1.1(b)(2)(A) because it found that the value of the benefit to be received from the offenses was $3.1 million.  In addition, the court increased the offense level

66

by 2 under U.S.S.G. § 3B1.1(c) for her role in the offense, and by 2 under U.S.S.G. § 3C1.1 for obstruction of justice. These increases resulted in a total offense level of 29. Walker's and Roberts' offense levels were similarly increased by two on a finding of more than one bribe, and by 13 on the calculation of approximately a $3.1 million benefit to be received from the offenses.

The Appellants argue that there was only one bribe alleged in the indictment, and that it was error to find two bribes. Further, the Appellants contend that the only benefit to be received by BHHI from the Golden Oaks project bribe was the $403,289.00 in profit to BHHI, as stated by Mitchell in a line item in the tax credit application that he prepared. The district court also included in its calculations the $216,000.00 for the 108 acres left over from the land that Smith sold to BHHI, the $61,522.00 salary that Roberts received from One Golden Oaks Ltd., the $400,000.00 developer's fee that Roberts anticipated from completing the project, and the $120,000.00 anticipated profit on the Shadow Wood project. The Appellants argue that the $2.4 million profit calculation is incorrect, and that the additional amounts were not part of the benefit to be received and should not be taken into account. Rather, Appellants argue that $403,289.00, which was the amount listed as the contractor profit on the Golden Oaks project's tax credit application, should have been used.

The amount of benefit to be received is a fact finding issue

67

that is reviewed for clear error. *United States v. Chmielewski,* 196 F.3d 893, 894 (7th Cir. 1999); *see also United States v. Bankston,* 182 F.3d 296, 317 (5th Cir. 1999), *vacated on other grounds sub nom. Cleveland v. United States,* 529 U.S. 1017 (2000). The district court need not determine the value of the benefit with precision. *United States v. Landers,* 68 F.3d 882, 884 n.2 (5th Cir. 1995). In fact, in determining the amount of benefit to be received, courts may consider the expected benefits, not only the actual benefits received. *See, e.g., Chmielewski,* 196 F.3d at 894-95; *United States v. Thickstun,* 110 F.3d 1394, 1400 (9th Cir. 1997).

The guideline commentary defines the value of "the benefit received or to be received" as "the net value of such benefit." U.S.S.G. § 2C1.1(b)(2)(A), comment. (n.2). The commentary provides two examples:

> (1) A government employee, in return for a $500 bribe, reduces the price of a piece of surplus property offered for sale by the government from $10,000 to $2,000; the value of the benefit received is $8,000. (2) A $150,000 contract on which $20,000 profit was made was awarded in return for a bribe; the value of the benefit received is $20,000. Do not deduct the value of the bribe itself in computing the value of the benefit received or to be received. In the above examples, therefore, the value of the benefit received would be the same regardless of the value of the bribe.

U.S.S.G. § 2C1.1, comment. (n.2). We have stated that these examples make clear that "direct costs should be deducted from the gross value of the contract." *Landers,* 68 F.3d at 884.

Applying these principles, we find that the district court clearly erred in calculating the Appellants' sentences. First, we find that the district court clearly erred in determining BHHI's anticipated profit to be $2.4 million, which was the difference between what BHHI allegedly was going to bill One Golden Oaks, Ltd. and what the actual building costs were projected to be. We can find no evidence in the record to indicate BHHI intended to bill One Golden Oaks, Ltd. $7.5 million. We also cannot find any evidence to support the district court's conclusion that building costs were projected to be $5.1 million. There is nothing in the record to support the district court's finding that the profit expected by the Appellants was $2.4 million. Apparently, the district court adopted the figure of $2.4 million as the profit to be made by BHHI, as described in the Appellants' PSRs, which is the major item in the $3.1 million benefits.

The Golden Oaks project's tax credit application is the best indicator in the record as to what the expected costs and profits were. Mitchell specifically noted in the tax credit application that BHHI's expected profit was $403,289.00, which we conclude is the best available evidence of what BHHI's expected profit was.

Second, we agree with the Appellants' argument that the benefit received should not have included the $216,000.00 that BHHI earned from the land sale to One Golden Oaks, Ltd. This sale had nothing to do with any bribe concerning Griffin's vote for the Golden Oaks project's tax credit application. Mitchell hired

Roberts to obtain land for the project, which he did. As a sophisticated businessman, Mitchell knew or should have known the potential costs of purchasing land in the location intended for the project. Roberts' act of making a profit off of his own business partner may be unethical and possibly actionable in a civil lawsuit; but it was not a crime and we do not believe it can be included within the scope of the bribe in this case.

Third, we do not believe that the benefit received should have included Roberts' salary amounting to $61,522[6] or his anticipated $400,000 expected bonus. Both the salary and bonus were negotiated with Mitchell before any bribery scheme came into being. And, Roberts would have received these amounts regardless of any bribes had the project been completed. Again, these amounts were negotiated with Mitchell, a sophisticated businessman, who clearly viewed the salary and bonus as part of the cost of doing business. These amounts cannot be included in the scope of the bribery scheme.

Fourth, we conclude that the $120,000 expected profit from the Shadow Wood project should not have been considered as part of the benefit received. The record includes very little testimony concerning this potential project. Regardless, the record clearly indicates that Griffin never voted on this project, nor was there

---

[6]The Appellants' PSRs indicated that Roberts received $61,529.94 in salary from Mitchell. During the Appellants' sentencing hearings, however, the district court stated that the amount of Roberts' salary was $61,522.

any evidence that she intended to so. Furthermore, the indictment does not even include a charge that refers to this project or a bribe for Griffin's vote. Therefore, the $120,000 should not have been included in the calculations.

We conclude that the expected benefit to the Appellants should have been the $403,289.00, which is stated in the tax credit application; and it was clear error for the district court to include the other amounts discussed above. As a result, the Appellants' sentences must be recalculated to account for this change.

Similarly, we conclude that the district court erred in applying a two level increase as a result of concluding that there were two bribes in this case. Our reading of the indictment is that there was only one bribe charged--the bribe for Griffin's vote on the Golden Oaks project. As noted above, though there was some testimony concerning other intended projects such as Shadow Wood, they had nothing to do with the bribe charged in this case. Therefore, this two level increase should not have been applied.

Lastly, we question the district court's determination that Mitchell is owed $783,455.00 in restitution, which was based on the amount of restitution recommended in the Appellants' PSRs. There are two puzzling aspects of this determination in the PSRs. First, the PSRs suggest that Mitchell is qualified to receive restitution under 18 U.S.C. § 3663(a) because he is a "proximate victim," who suffered financial harm resulting from the Appellants' criminal

71

conduct. Secondly, the PSRs indicate the amount of restitution owed to Mitchell by adding the $61,529.94[7] in salary that he paid to Roberts; the $328,133.87 for the land purchased for the Golden Oaks project; credit card charges totaling $2,570.22; and $391,221.05 for development costs including appliances, application fees and lumber.

We are not convinced that the amount of restitution suggested by the PSRs and ordered by the district court is justified. We cannot speak to the credit card charges incurred by Mitchell because the record does not indicate what they were for and when they were incurred. However, as we noted above, Roberts' salary and the land purchase occurred before the fruition of the bribery scheme and were part of what Mitchell clearly viewed as acceptable costs of putting the project together. Therefore, these amounts should not be included in any restitution figure.

Further, the development costs noted in the PSRs also should not be included for restitution. These costs had nothing to do with the bribery scheme, and would have been incurred had there never been a bribery scheme. Again, Mitchell agreed to these costs as part of doing business.

We note that this Court has expressly held that a victim who is "directly and proximately harmed" in the context of 18 U.S.C. § 3663A may be entitled to restitution. *See **United States v.***

------

[7]*See supra* note 5.

*Mancillas,* 172 F.3d 341, 343 (5th Cir. 1999) (citing *United States v. Hughey,* 147 F.3d 423, 437 (5th Cir. 1998)). However, we also have restricted "the award of restitution to the limits of the offense." *Id.* Our reading of the record indicates that any losses incurred by Mitchell resulted from the Golden Oaks project collapsing because of BHHI's or LCCM's inability to obtain interim financing and performance bonds. This collapse had nothing to do with the bribery scheme for which the Appellants were charged. Rather, Mitchell was a sophisticated businessman who should have been able to evaluate whether a construction company was capable of performing a particular project.

The record does not indicate that there was a separate hearing detailing whether Mitchell qualifies for restitution as a "proximate victim" and what amount he should receive if he does qualify. Therefore, on remand, the district court should conduct a hearing to determine Mitchell's status as a "direct and proximate" victim, and the amount of restitution that is "attributable to the specific conduct supporting the offense of conviction." *Hughey,* 147 F.3d at 437

## III. CONCLUSION

We REVERSE the Appellants' convictions on counts 6 and 7 for mail fraud. We AFFIRM the Appellants' convictions on the other counts for which they were indicted. We vacate the sentence of

73

each Appellant and REMAND this case for resentencing in light of our opinion.  The district court also should conduct a hearing for the purpose of determining whether Mitchell qualifies as "a direct and proximate victim" and for the purpose of determining the quantum of restitution, if any, to which he may be entitled.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.